Jackie E. BARR, # 38840-115, Petitioner,

v.

UNITED STATES of America et al., Respondents.

No. C-75-1071-D.

United States District Court, W. D. Oklahoma.

March 8, 1976.

Jackie E. Barr, pro se.

David L. Russell, U. S. Atty., by Drew Neville, Asst. U. S. Atty., Oklahoma City, Okl., for respondents.

## ORDER

DAUGHERTY, Chief Judge.

This is a proceeding for Writ of Habeas Corpus by a federal prisoner at the Federal Reformatory, El Reno, Oklahoma, to which the respondents have filed a Motion to Dismiss. The petitioner claims that he is entitled to immediate release or other appropriate habeas relief because of errors in the determination of his parole eligibility and because the conditions of his confinement and lack of programs available to him defeat the purpose of the Youth Corrections Act.

Petitioner states that he was convicted after a jury trial of violation of § 841 of Title 21, United States Code (distribution of heroin), on August 16, 1973, and thereafter sentenced under the provisions of the Federal Youth Corrections Act, 18 United States Code § 5010(b). An unsuccessful appeal followed and petitioner surrendered for incarceration on October 15, 1974. On January 20, 1975, the petitioner appeared before the United States Board of Parole for parole consideration. On January 30, 1975, the Board continued further consideration of the petitioner in an institutional review hearing until March 1976. The reasons stated for the continuance were as follows:

"Your offense behavior has been rated as high severity. You have a Salient Factor score of eight. You have been in custody a total of three months. Guidelines established by the Board for youth cases which consider the above factors indicate a range of 16 to 20 months to be served before release for cases with good institutional performance and adjustment. After careful consideration of all relevant factors and information presented, it is found that a decision outside the guidelines at this consideration does not appear warranted."

Petitioner then sought review of the Board's decision at the regional level and the previous decision of the Board was affirmed on March 4, 1975. He also pursued a national appeal which again resulted in an affirmation of the original decision.

The petitioner asserts the Board considered a conviction for a traffic violation resulting only in a fine which was improper because he was not then represented by counsel. He relies upon *Wren v. United States Board of Parole*, 389 F.Supp. 938 (N.D.Ga.1975), which held that uncounseled constitutionally invalid prior convictions cannot be considered by the Parole Board in making parole determinations. This extension of *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) is not applicable, however, in the situation here presented because petitioner's allegations do not establish that the prior conviction was constitutionally invalid. In *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), the Supreme Court held:

"[T]hat absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial." 407 U.S. at 37, 92 S.Ct. at 2012.

The Court specifically did not consider the requirements of the Sixth Amendment as regards to the right to counsel where loss of liberty is not involved and pointed out:

"The run of misdemeanors will not be affected by today's ruling." 407 U.S. at 40, 92 S.Ct. at 2014.

Since the petitioner was not deprived of his liberty, the challenged conviction is within the "run of misdemeanors" not affected by the *Argersinger* rule. As the conviction was not constitutionally infirm, it was not forbidden that the Parole Board consider it. In determining whether to grant a parole, it is perfectly proper to consider a prisoner's prior criminal record and such consideration

does not amount to an imposition of additional punishment. *Jones v. Salisbury*, 422 F.2d 1326 (CA6 1970), cert. denied, 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 69, reh. denied, 400 U.S. 931, 91 S.Ct. 190, 27 L.Ed.2d 192.

■ Petitioner also objects to the action of the Board in considering his marital difficulties, which allegedly resulted in him being deprived of a point on his Salient Factor score. Reasonably a prisoner's marital situation is a relevant factor in making parole decisions and the weight to be given such action is a matter within the discretion of the Parole Board. See *Barradale v. United States Board of Paroles and Pardons*, 362 F.Supp. 338, 341 n. 3 (M.D.Pa. 1973). See also *Scarpa v. United States Board of Parole*, 477 F.2d 278 (CA5 1973), reversed and remanded for consideration of question of mootness, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1974), conformed to 501 F.2d 992 (District Court directed to dismiss as moot).

■ The petitioner further claims that he was denied due process because he was not permitted to review the Board's file and to cross-examine witnesses against him. There is no right to inspect the files of the Board. *Ott v. Ciccone*, 326 F.Supp. 609 (W.D.Mo.1970). Nor does a prisoner have a constitutional right to cross-examine members of the Board or persons who may have provided information to the Board. *Tarlton v. Clark*, 441 F.2d 384 (CA5 1971), cert. denied, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713. A prisoner may be entitled to a "modicum of due process" in a hearing to consider his release on parole. *Mower v. Britton*, 504 F.2d 396 (CA10 1974). Such due process, however, does not embrace the full panoply of rights due a parolee in a parole revocation hearing and:

". . . he is not entitled to an opportunity to present witnesses and documentary evidence in support of his release on parole. Nor is an inmate entitled to confront and cross-examine persons who have provided the Board with adverse information, or to interrogate the Board members. A prisoner does not have a constitutional right to examine his record or Parole Board files, and he is not entitled to rebut information in possession of the Board which militates against his parole. The foregoing rights are the kind usually associated with an adversary-type hearing or adjudicatory proceedings in which vital issues of fact are to be decided which affect important rights of the litigants. The Board does not function as an adversary of the prisoner, and it has an interest in releasing those who qualify for parole. *Menechino v. Oswald*, 2 Cir. 1970, 430 F.2d 403, 407–408, cert. denied, 1971, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635; *Scarpa v. United States Board of Parole*, supra. The above procedural due process rights would convert the inmate's interview before the Parole Board into an adversary hearing, thereby unnecessarily hindering and burdening the parole decision-making process." *Wiley v. United States Board of Parole*, 380 F.Supp. 1194, 1200 (M.D. Pa.1974).

■ Petitioner also contends that he was not given sufficient reasons for the denial of his parole. It is now settled that a prisoner is entitled to a "brief statement" of the reasons for the action of the Board. *Mower v. Britton*, supra. With an offense severity rating of "high" and a salient factor score for offender characteristics of 8, the appropriate "Guidelines for Decision-making" applicable to youths indicate 16 to 24 months should be served before release. 20 C.F.R. § 2.20. The petitioner was informed of this and it was pointed out that he had only been in custody three months. On appeal it was determined that the reasons given justified the decision and the petitioner was so notified.

■ The statement adequately advised the petitioner of the basis for the Board's action. There was not in petitioner's case the reliance upon the "boiler plate reason" that his release would depreciate the seriousness of the offense and thus be incompatible with the welfare of society condemned in *Lupo v. Norton*, 371 F.Supp. 156 (D.Conn. 1974); *Soloway v. Weger*, 389 F.Supp. 409 (M.D.Pa.1974); *Billiteri v. United States*

*Board of Parole*, 385 F.Supp. 1217 (W.D.N.Y.1974); *Craft v. Attorney General of United States*, 379 F.Supp. 538 (M.D.Pa.1974); *Candarini v. Attorney General of United States*, 369 F.Supp. 1132 (E.D.N.Y.1974). Here the principal reliance by the Board upon the guidelines is manifest and the petitioner well knows the basis for the Board's action. The Administrative Procedure Act would seem to require no more. It mandates the statement of reasons. It does not necessitate that the prisoner agree or be satisfied with the reasons given. As pointed out in *Mower v. Britton*, supra, the courts do not purport to control discretion.

In the special situation of the youth offender, one court has imposed a further requirement that the reasons must relate to the adjustment and rehabilitation efforts made within the institution. *Snyder v. United States Board of Parole*, 383 F.Supp. 1153 (D.Colo.1974). Although finding the use of guidelines properly within the discretion afforded to the Board it would in effect require the Board to justify any decision to follow the guidelines in the cases of a youthful offender. Board policy now requires additional reasons be given when the decision is made outside the range indicated by the guidelines. 28 C.F.R. § 2.13(c). The result reached by the court seems unwarranted. If the adoption of the guidelines was not an arbitrary act, as recognized by the court, it seems inconsistent to demand that an explanation be given for their application in a particular case. Individualized treatment and consideration does not preclude an identical statement of reasons for all persons for whom, after such individualized consideration, treatment in accordance with the guidelines is best indicated. To require more specific reasons from the Board when the obvious and true reason is the reliance on the guidelines, realistically is to infringe upon the discretion of the Parole Board despite any disclaimers to the contrary. By inference the court has said that you cannot deny parole unless the prisoner's adjustment and rehabilitative efforts are unsatisfactory and that it is an abuse of discretion for the Board to make a decision based primarily on the guidelines. The guidelines are established specifically for the cases with good institutional adjustment and program progress, 28 C.F.R. § 2.20(b), as petitioner was advised in his statement of reasons. If the petitioner's adjustment and program progress had not been satisfactory his continuance would have been above the time ranges contained in the guidelines. Due process and the Administrative Procedure Act are satisfied with a meaningful and understandable statement of reasons for the action. The Youth Corrections Act should not be read as engrafting an additional requirement of an evaluative statement of the prisoner's rehabilitation efforts. In petitioner's case such a statement would not have enhanced his understanding of the action taken as the Board had already indicated that his institutional adjustment and program progress was good. It is the function of the Parole Board to determine if the prisoner is ready for release and not to devise a program of treatment and establish institutional goals. That role is properly the task of other personnel within the Bureau of Prisons.

Perhaps the more fundamental issue, only vaguely defined in the original petition but expressly articulated by petitioner in his Response to the respondents' Motion to Dismiss, is the use of guidelines at all in decision making for youth offenders. In reasoning akin to that of the court in *Snyder v. United States Board of Parole*, supra, the court in *United States ex rel. Mayet v. Sigler*, 403 F.Supp. 1243 (M.D.Pa.1975) proceeded one step farther and concluded the guidelines themselves were objectionable. It stated:

"Such guidelines, which utilize an analysis of the prisoner's offense as a critical factor in determining how long he will be incarcerated, violate the purpose of the Youth Corrections Act. The Board of Parole has a duty to consider prisoners sentenced under its provisions for parole at any time. The history of the Act shows that the prisoner's response to so-called treatment and his supposed rehabilitation are the primary considerations to be used in determining when a Youth

Offender should be released on parole. 1950 U.S.Code Congressional Service, page 3985.

In a recent discussion of the Youth Corrections Act, the United States Supreme Court in *Dorszynski v. United States,* 418 U.S. 424, 434, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974), stated, 'An important element of the program was that once a person was committed for treatment under the Act, *the execution of sentence was to fit the person, not the crime for which he was convicted.*' (Emphasis added). Although the holding in *Dorszynski* was limited to a pronouncement that District Judges must find that youth offenders will not benefit from treatment under the Youth Corrections Act before they may be given regular adult sentences, the quoted language nevertheless supports the historical analysis of the Act which places great stress on treatment and rehabilitation. Thus, the guidelines, which take offense severity into account as a critical factor in determining how long a Youth Offender will be incarcerated, violate the purposes of the act and are illegal." 403 F.Supp. at 1244.

■ This court does not agree that the Board has exceeded its statutory authority in utilizing the guidelines in making parole decisions for youth offenders. In exercising its discretion the Board takes into consideration many factors. See 28 C.F.R. § 2.19. The guidelines were adopted:

". . . To promote a more consistent exercise of discretion, and enable fairer and more equitable decision making *without removing individual case consideration.*" (28 C.F.R. § 2.20(a) Emphasis added).

Guidelines consist of separate tables for adult offenders and youth offenders. Each table is constructed to indicate approximate ranges of time to be served for various combinations of two factors: (1) severity of the offense and (2) characteristics of the offender. Offenses are grouped in six rows of categories from "low" to "greatest" severity. Offender characteristics (salient fac-

tor score) are grouped in four categories from "poor" to "very good" probability of favorable parole performance. At the intersection of each variable there appear in the tables in multi-month ranges, different time periods of confinement that provide a guideline for the decision maker considering a prisoner with particular offense severity and offender characteristics. It is explicitly stated:

"These time ranges are merely guidelines. Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered. For example, cases with exceptionally good institutional program achievement may be considered for earlier release." 28 C.F.R. § 2.20(c).

Obviously, use of the tables does not preclude individualized consideration of each youth offender's case. It, in fact, makes it absolutely necessary since before the tables can be applied to a particular offender his individual characteristics must be determined in order to locate the appropriate category of offender characteristics. The guidelines do not restrict discretion but simply provide a rational basis founded upon prior research and experience for its exercise with respect to the particular offender. To deny the Board the right to consider the offense severity would severely restrict its discretion.

■ To limit the Board to a consideration of institutional adjustment and rehabilitation programs not only is not justified by any reading of the Youth Corrections Act it would appear directly to interfere with the objective of a sentence designed "to fit the person". 18 U.S.C. § 5006(g) states:

" 'Treatment' means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders."

It seems totally naive to conclude that a Board could evaluate a person and provide an effective program of treatment without any consideration of what he has done in the past. Rehabilitation is plainly the goal

of the Youth Corrections Act. Rehabilitation, however, relates to an individual. That individual is a person who has committed a murder, robbery, car theft or some other offense of greater or lesser seriousness. That very act says something about the "antisocial tendencies" of the offender which treatment must be designed to correct. Any rehabilitation program which ignores that fact must be inadequate to serve either the interest of the public or the offender. The ultimate purpose of the Act is "to protect the public". The means selected by Congress to accomplish this purpose is "by correcting the antisocial tendencies of youth offenders". The judgment of when the means have been successful and it is safe to return the individual to society was properly left to the expertise of the Youth Corrections Division of the Parole Board.

It is often reiterated, but increasingly disregarded in practice, that members of the Parole Board are experts in the field of corrections and the courts are not. It is a dangerous intrusion into the field of corrections for a court to disarm the experts of a valuable predictive device developed in the crucible of experience. Certainly this court cannot conclude that its use is arbitrary and has no rational basis or relation to the object of protecting the public and the rehabilitation goal of correcting the offender's "antisocial tendencies", particularly, when it is administered with the flexibility contemplated by the regulations. When the time comes to make a decision for or against release the prognosis of a successful entry into society is all-important. Congress surely did not intend that it be a guessing game, divorced from reality. Prediction of human behavior is at best an inexact science in which the decision-maker needs all the guidance he can muster. All relevant factors should be available to the Board for the exercise of its discretion and the court should not judicially excise the use of relevant information or helpful techniques. Viewed as a tool and not a rule the guidelines do not have the effect of altering the sentences of the youth offender into determinate sentences and they do not violate the spirit, purpose and legislative intent of the Youth Corrections Act.

 Finally, the petitioner makes a generalized complaint about the environment of the institution where he is confined and the inadequacy of the rehabilitation programs available to him. The court's comments in *Foote v. United States,* 306 F.Supp. 627, 628 (D.Nev.1969) are applicable here:

"The Attorney General is given authority to determine the place of confinement of any person committed to custody. 18 U.S.C. § 4082. The authority is exercised by the Bureau of Prisons. *Hogue v. United States,* 287 F.2d 99 (5th Cir. 1961); *Rayborn v. Swope,* 215 F.2d 604, 605 (9th Cir. 1954). Section 5011, Title 18, United States Code, likewise clearly confers upon the Director of the Bureau of Prisons the authority to determine that even maximum security in a United States Penitentiary is a proper mode and place of confinement. A person committed under the Federal Youth Corrections Act is within the scope of this authority. 18 U.S.C. § 5015(b); *Coats v. Markley,* 200 F.Supp. 686 (S.D.Ind.1962). See also *Arkadiele v. Markley,* 186 F.Supp. 586 (S.D.Ind.1960); *Sonnenberg v. Markley,* 289 F.2d 126 (7th Cir. 1961). Mere dissatisfaction with the program at the place of incarceration is no basis for relief. *Young Hee Choy v. United States,* 322 F.2d 64 (9th Cir. 1963). The objection to the place of confinement has no merit."

 The petitioner is not entitled to relief. He has stated no denial of a federal constitutional right which requires his immediate release from custody. The lawful denial of parole does not impinge upon any constitutional right. *Carson v. Executive Director, Department of Parole,* 292 F.2d 468 (CA10 1961). This court cannot serve as a super parole board. *Wiley v. United States Board of Parole,* supra.

Accordingly, the Petition for Writ of Habeas Corpus will be denied.

IT IS SO ORDERED.